```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION

UNITED STATES OF AMERICA          :    CRIMINAL ACTION NO.
                                  :
           v.                     :    NO. 1:14-CR-395-TCB-ECS
                                  :
                                  :    SUPERCEDING
KELVIN DURHAM,                    :
MARCUS DAVIS,                     :
JABARI ALBERT, and                :
KEITH HAWKINS,                    :
                                  :
     Defendants                   :
```

**REPORT AND RECOMMENDATION**
**OF THE MAGISTRATE JUDGE**

**I.**
**Introduction and Contentions**

This case is before the Court on four motions to dismiss filed by Defendants Durham, Davis, Albert, and Hawkins, [Docs. 85, 88, 89, 92]. The government responded to the motions, [Doc. 98], and Defendants filed replies, [Docs. 101, 103, 104, 105], the last of which was filed on February 13, 2015. The motions are now ready for a report and recommendation to the district judge.

The motions to dismiss the indictment assert that the conduct of law enforcement in this investigation was so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. [Docs. 85 at 5; 88 at 5; 89 at 5-6; 92 at 5]. To support this argument of a due process violation Defendants submit that the government confidential informant ("CI") initiated the contact with Defendant Durham and

introduced the idea of a robbery to him; that the CI and undercover agent ("UC") exerted pressure on Mr. Durham to go through with the robbery and "enticed" Mr. Durham to recruit team members for the job; and that the CI and the UC developed the idea that weapons would be needed for the job and motivated the Defendants to agree to the job by telling them that ten kilograms of cocaine would be available for the taking. [Docs. 85 at 5; 88 at 5; 89 at 6; 92 at 6].

The government proffers a different interpretation of the story line, derived from the affidavit filed in support of the criminal complaint. See [Doc. 1].[1] The government submits that Mr. Durham contacted the CI looking to acquire firearms in April of 2014 and that in June 2014 Durham told the CI that he was actively looking for "a good lick," meaning an opportunity for a robbery. [Doc. 1 at 3]. The CI reported that Durham was known for robbery and had served time in prison for armed robbery. Id. Mr. Durham's convictions were confirmed. Id. Later in June, the CI apparently contacted Mr. Durham suggesting that he knew of a stash house with ten kilograms of cocaine that could be robbed. Id. Mr. Durham expressed interest, and a meeting was set up for July 2 that Mr. Durham did not show up for. Id.

In early September, nearly three months after his no-show, Durham contacted the CI and asked to meet. A meeting occurred on

---

[1] The references to [Doc. 1] will be to the pages of the affidavit sworn to and attached to the criminal complaint.

2

September 23, 2014, among the CI, Durham and the UC. Id. at 4. The meeting took place in the UC's car outside a restaurant. Id. The parties discussed the possibility of making a "move," meaning a home invasion robbery to obtain cocaine. Id. The UC advised Mr. Durham that he knew of a location where cocaine would be. Id. Mr. Durham told the UC he was ready to commit. Id. The UC advised Mr. Durham that he routinely picked up five kilograms of cocaine at the location and that he could guarantee a minimum of ten would be there to be taken. Id. at 4-5. He also told Mr. Durham that the stash house would be guarded by three to four armed Mexicans. Id. at 4.

Further details regarding the plan for the robbery were discussed at this meeting, including the need for the UC to meet the members of Defendant's team that would handle the robbery, so he could make sure he (the UC) would not be shot during the hold-up. Id. at 5. Mr. Durham was told the area of Atlanta where the alleged Mexican drug source operated. Id. When he left the vehicle, Mr. Durham showed the CI and UC a handgun that he had concealed in his pocket. Id. at 5-6. This meeting on September 23, 2014, was apparently videotaped and audio-taped. [Doc. 98 at 4].

On September 29, 2014, Mr. Durham contacted the CI, and Mr. Durham said he and his people were ready to do the job. [Doc. 1 at 6]. Between September 29 and 30, the UC and Mr. Durham exchanged text messages and agreed to meet on October 1. Id. On that date, Mr. Durham, accompanied by Defendant Albert, met with the UC and CI. Id. at 6-7. They discussed the proposed robbery at length, in particular

3

the manner in which entry would be made. Id. The UC again advised Mr. Durham and Mr. Albert that they could guarantee that ten kilograms would be available for taking at the stash house when the robbery occurred. Id. at 7. The UC also wanted to meet the entire team, again, purportedly because he did not want to get accidentally shot during the robbery. Id. The UC stated that there was no pressure on the Defendants to commit and that if there was any hesitation on their part, they would not proceed. Id. at 7-8. Mr. Durham and Mr. Albert asked many questions about the details of the job. Id. at 8. Both acknowledged that there was no hesitation on their part. Durham at one point stated that "Everybody I done rocked with, I done rocked with before, we go in on them folks, boy." Id. It is unclear from the affidavit whether this meeting was also video and audio taped, although the specific quotes would suggest that it was.

On October 17, 2014, Durham texted the UC to confirm that they would meet and then do the job. Id. at 9. They met at a Krystal in Decatur. Id. This meeting was also video and audio-taped. [Doc. 98 at 10-11]. All four Defendants showed up. All four got in the UC vehicle. [Doc. 1 at 9]. Defendants discussed how they would do the job – "hit the door." Id. The UC was advised to stand to the side out of the way in case of shots fired. Id. The UC then said he had to go pick up a Corvette equipped with a trap compartment built in to hold the drugs, which the Defendants could use, before they did the job. Id. at 9-10. When asked when they would hit the house, the

4

UC replied "Now," and invited the Defendants to follow him to pick up the Corvette. Id. at 10. All proceeded to a storage unit in Tucker. Id.

The Corvette was parked outside a unit at the storage facility. Id. The UC got in, started it, and opened the trunk to show Defendants the trap compartment. Id. At that point, Mr. Durham pulled a pistol and pointed it at the UC, telling him not to move. Id. Defendant Hawkins pulled a handgun, as did Davis. Id. At this point an ATF response team deployed "flash bangs" and came out of the storage unit. Id. at 11. All the Defendants were arrested on the scene and several firearms were seized. Id.

## II.
## Legal Standards

Defendants claim that the government engaged in such outrageous conduct as to violate their rights to due process of law under the Constitution, requiring dismissal. The issue presented is whether Defendants have sufficiently set forth conduct that would sustain their claim and whether they are entitled to an evidentiary hearing on their motions. My recommendation is that the motions be denied without an evidentiary hearing.

In United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637 (1973), the Supreme Court recognized outrageous governmental conduct as a legal defense. To succeed under this defense, the defendant must show that the challenged governmental conduct violated "that 'fundamental fairness, shocking to the universal sense of justice,'

AO 72A
(Rev.8/82)

mandated by the Due Process Clause of the Fifth Amendment." Russell, 411 U.S. at 432, 93 S. Ct. at 1643 (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 80 S. Ct. 297, 304 (1960)); see also Hampton v. United States, 425 U.S. 484, 96 S. Ct. 1646 (1976); United States v. Tobias, 662 F.2d 381 (5th Cir.1981), cert. denied, 457 U.S. 1108, 102 S. Ct. 2908 (1982).[2] Whether outrageous governmental conduct exists "turns upon the totality of the circumstances with no single factor controlling," and the defense "can only be invoked in the rarest and most outrageous circumstances." Tobias, 662 F.2d at 387; see also United States v. Michael, 17 F.3d 1383, 1386 (11th Cir. 1994) ("Dismissal is only favored in the most egregious cases.").

Neither the Supreme Court nor the Fifth nor Eleventh Circuits has ever reversed a case on the ground of outrageous government conduct. United States v. Sayers, 698 F.2d 1128, 1130 (11th Cir. 1983); United States v. Gianni, 678 F.2d 956, 959-60 (11th Cir.), cert. denied, 459 U.S. 1071, 103 S. Ct. 491 (1982). Recently, in United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011), the Eleventh Circuit noted that:

> We have never applied the outrageous government conduct defense and have discussed it only in dicta. See United States v. Ciszkowski, 492 F.3d 1264, 1272 (11th Cir.2007) (Carnes, J., concurring) (describing the outrageous

---

[2] Decisions of the Fifth Circuit handed down before Oct. 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Tobias was decided on November 30, 1981, and is therefore not binding authority.

6

government conduct doctrine as rooted in "speculative dicta" and noting that we have never "reversed a conviction or vacated a sentence on th[is] basis"). Several of our sister circuits have either rejected this defense completely, see United States v. Boyd, 55 F.3d 239, 241 (7th Cir. 1995), or have been sharply critical of the defense, see, e.g., United States v. Tucker, 28 F.3d 1420, 1422–27 (6th Cir. 1994) (citing separation of powers concerns and discussing the lack of authority for any argument that outrageous government conduct violates due process); United States v. Santana, 6 F.3d 1, 3 (1st Cir. 1993) ("Outrageous misconduct is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts.").

Nevertheless, after further stating that it had "never acknowledged the existence of the outrageous government conduct doctrine," the Court in Jayyousi observed that "outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." 567 F.3d at 1111-12 (citing Ciszkowski, 492 F.3d at 1270).

### III.
### The Law Applied

In this case, the undersigned concludes that the conduct alleged by the Defendants does not rise to a level of "fundamental [un]fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." Russell, 411 U.S. at 432, 93 S. Ct. at 1643. The government has proffered facts under oath through the affidavit presented with the complaint which establish probable cause for the charges ultimately returned in the superceding indictment, namely assault upon an officer of the United States while engaged in his official duties in violation of 18

7

U.S.C. § 111 (a) and (b), as well as conspiracy to possess cocaine in violation of 21 U.S.C. §§ 846 and 841. See [Doc. 61].

Even taking the statements in the affidavit in their light most favorable to the Defendants, the government's conduct did not deprive Defendants of due process guarantees. The totality of the circumstances does not show that the government instigated the criminal activity in this case or introduced the idea of the crime to Mr. Durham. The affidavit attests that the CI came to the government because Mr. Durham had told him he was looking for "a good lick" to hit and needed some "big dope."  Mr. Durham had a record of robbery convictions. This was before the CI told Mr. Durham in June that he knew of a possible target for a robbery and Mr. Durham indicated an interest. Nothing was pursued initially, and Mr. Durham was seemingly uninterested in following up. It was not until September, nearly three months later, that Defendant Durham re-contacted the CI to pursue the robbery idea. Defendant had nearly three months of no contact with the CI to walk away without pursuing the matter. But he came back.

Furthermore, the subsequent history does not show an operation in which the government was so pervasively over-involved as to challenge fundamental fairness. The facts in the affidavit show that Mr. Durham was an active, motivated participant. He was not "directed" to recruit a team – a team was organically necessary for the crime he agreed to participate in. The government did not entice him to obtain weapons for the home invasion, nor did they actually

8

procure any tools for the robbery, except arguably the Corvette with the trap compartment the UC was going to let the Defendants use for the robbery. Weapons would obviously be required for a successful rip-off of a Mexican drug stash house. What weapons were needed was left up to the Defendants.

The government also did not introduce the idea of this robbery to the other Defendants – Mr. Durham did that by recruiting them. And, when Mr. Albert, for example, came to the meetings to discuss carrying out this violent plan, he was fully involved. Likewise, all four of the Defendants met together on the day of the proposed robbery with the CI and the UC as full partners in this endeavor – their assistance and role was not to be meager at all – they were the ones taking on the role of the lead participants in a rip off that would likely result in death or injury to the Mexican drug dealers they were robbing. Indeed, their advice to the government UC was to stay out of harm's way when the "hit" went down, so he wouldn't get shot. If there was "know-how" provided here regarding this home invasion robbery plan, it was not coming from the government; it was from the Defendants.

Exactly what was going on when the Defendants pulled their weapons on the UC is still unclear. They may have "made" the UC and suspected the government's involvement. They may have decided to rob the UC, thinking he had drug proceeds for the purchase of the five

9

kilograms of cocaine.[3] Maybe they wanted the Corvette. But whatever involvement the CI and the UC had in the development of the robbery scenario, that scenario did not involve the Defendants pulling their weapons on the UC at the storage unit. The government certainly did not initiate that plan.

Although the facts, taken in their best light for Defendants, show that the government dangled the opportunity to rip off some drug dealers in front of Mr. Durham and followed up with him when he took the bait, that conduct was not outrageous. "[G]overnment infiltration of criminal activity is a recognized and permissible means of investigation ..., even though the government agent supplies something of value to the criminal." Tobias, 662 F.2d at 386 (citations and internal quotation marks omitted). In particular, "[w]here the government is investigating offenses involving illegal drugs, it often must engage in undercover operations because it is very difficult to discover the contraband. This activity by the government does not generally constitute outrageous conduct." United States v. Lopez-Cruz, 170 F. App'x 634, 636 (11th Cir. 2006) (unpublished decision). "Moreover, challenges to the 'reverse sting' method of police investigation have been rejected by this Court on numerous occasions." United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir. 1998).

---

[3] Five kilograms of cocaine would have a wholesale value of close to $100,000, based on the values per kilo the Court is familiar with from many other cases.

10

Sanchez, indeed, is informative. In that case, the scenario was very similar to the case at bar. The ATF received information from a confidential informant about a group of armed home invaders who would rip off stash houses. Id. at 1412. Working with the informant, the government created a reverse sting operation by which the defendants agreed to the details of a home invasion. Id. They were arrested in a parking lot where they had assembled in readiness for going to the stash house, which they had been told would involve 50 kilograms of cocaine and 300 pounds of marijuana. Id. After discussing the outrageous government conduct defense, the Court found that the government's conduct "[did] not approach that demonstrable level of outrageousness the case law suggests would be necessary for reversal of the defendants' convictions." Id. at 1414. The same result should obtain in this case, which is virtually indistinguishable.

"Where the government merely presents a defendant with a routine criminal opportunity of which the defendant is more than willing to take advantage, the government's actions do not amount to outrageous conduct warranting dismissal." United States v. Rolon, 445 F. App'x 314, 322 (11th Cir. 2011) (unpublished decision). In this case, the government presented Mr. Durham and the other Defendants with a "routine" criminal opportunity that they appeared to have been more than willing to take advantage of.

Insofar as an evidentiary hearing is concerned, such a hearing would be inappropriate. "[W]ithout sufficient factual allegations to

11

support an outrageous-governmental-conduct defense, the Court need not hold an evidentiary hearing on the issue." United States v. Galvis-Pena, No. 1:09-CR-25-TCB-CCH-4, 2012 WL 425240, at *5 (N.D. Ga.) (Batten, J.) (citing United States v. Holloway, 778 F.2d 653, 658 (11th Cir. 1985)). Moreover, Defendants' contentions about the agents' conduct in this case "raise questions that are intermeshed with questions going to the merits of the case because they would require proof of the criminal conduct alleged in the indictment," and therefore, "they are not capable of resolution without a ['trial on the merits'] under Fed. R. Crim. P. 12(b)[(1)]." Id. at *5. Rule 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added).

### III.
### Conclusion

Accordingly, for the reasons discussed above, the undersigned **RECOMMENDS** that the motions to dismiss, [Docs. 85 , 88, 89, 92], be **DENIED** and that the requests for an evidentiary hearing be likewise **DENIED.**

**SO REPORTED AND RECOMMENDED**, this 17th day of March, 2015.

*s/ E. Clayton Scofield III*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)