IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KELVIN DURHAM, MARCUS
DAVIS, JABARI ALBERT, AND
KEITH HAWKINS,

      Defendants.

CIVIL ACTION FILE

NUMBER 1:14-cr-00395-TCB-
ECS

## O R D E R

This case comes before the Court on Magistrate Judge E. Clayton

Scofield's Report and Recommendation (the "R&R") [108], which

recommends that Defendants' motions to dismiss and requests for a

hearing [85, 88, 89, 92] be denied. Defendants Kelvin Durham, Marcus

Davis, and Jabari Albert have filed objections to the R&R [111, 112,

113].[1]

A district judge has a duty to conduct a "careful and complete"

review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d

---

[1] Defendant Hawkins has filed no objections to the R&R.

732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982)).[2] This review may take different forms, however, depending on whether there are objections to the R&R. The district judge must "make a de novo determination of those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[3]

"Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be

---

[2] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing the continuing validity of *Nettles*).

[3] *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

Defendants' motions to dismiss assert that the conduct of law enforcement in this action was so outrageous that it violated due

3

process guarantees and dismissal of the indictment is warranted.[4]
Specifically, Defendants allege that the Government's confidential
informant ("CI") initiated contact with Durham, that an undercover
agent exerted pressure on Durham to follow through with a planned
robbery, and that the conspiracy was, in effect, manufactured by the
Government. Judge Scofield concluded that Defendants have failed to
show that the Government's conduct was so outrageous, rare, shocking
and unconscionable as to demand dismissal, and he recommends denial
of their motions. The Court has conducted a careful, de novo review of
the R&R and Defendants' objections thereto. Having done so, the Court
finds that Judge Scofield's factual and legal conclusions were correct
and that Defendants' objections have no merit.

---

[4] Courts recognize that government involvement in a crime may in theory
become so outrageous and excessive that it violates due process and requires
dismissal of charges against a defendant. *United States v. Russell*, 411 U.S. 423
(1973). To establish such a due process violation, the government's conduct must be
so outrageous as to offend common notions of fairness and shock the universal sense
of justice. The burden is heavy—the Eleventh Circuit has never found the defense
availing and has never reversed a case on such grounds.

## I.   Factual Contentions and Objections

The objections filed by Defendants Durham, Davis, and Albert mirror each other in all material respects. For that reason, unless specifically noted below, the Court's analysis applies equally to each of their respective objections.

Defendants effectively raise two objections to the R&R. First, they challenge the magistrate judge's conclusion that the Government's conduct did not deprive Defendants of due process. And second, they argue that a hearing is necessary to resolve factual disputes regarding the underlying criminal complaint. These objections simply resurrect the arguments already advanced in support of Defendants' motions to dismiss and will be addressed in turn. But first, a brief recitation of the underlying story, as told by the undercover agent and by Defendant Durham.

ATF[5] Special Agent A. McLeod's affidavit, which forms the basis of the criminal complaint, states that Durham contacted the Government's CI in June 2014, saying he was actively looking for "a good lick" (a

---

[5] Bureau of Alcohol, Tobacco, Firearms and Explosives.

5

robbery) to hit and needed some "big dope." Later that month, the CI

contacted Durham and suggested that he knew of a drug stash house

with approximately ten kilograms of cocaine that could be robbed.

Durham expressed interest and set up a meeting with the CI's contact

(undercover agent Task Force Officer A. Edmondson), but Durham

failed to show for the meeting and nothing came of the CI's offer—until

nearly three months later. In September 2014, Durham reached out to

the CI and asked to meet about the drug stash house. Durham told the

CI that the reason he had not been in touch since the summer was that

he and his crew had been "on a lick" in Alabama. Back in Georgia and

ready to carry out another robbery, Durham asked to be put in touch

with the CI's contact about the stash house. At that point, the CI put

Durham back in touch with the Government's undercover agent. At an

in-person meeting the next day, the undercover agent explained to

Durham that he knew of a stash house where there would be at least

ten kilograms of cocaine. And he told Durham that there were typically

three to four armed Mexican individuals at the house. Durham asked

about the location of the stash house, but the undercover agent

6

explained that he would not know until the day of, that his contact would text him the location just before he was to make a pick-up. The undercover agent explained that Durham would be responsible for scripting how the robbery would take place, but he did want to meet Durham's associates before the robbery, to make sure they were all familiar with him so that he would not get hurt. Durham agreed.

A few days later, on September 29, Durham and the CI spoke again. Durham stated that he and his "people" were ready to conduct the robbery. A few texts were later exchanged between Durham and the undercover agent, and they planned a second meeting. On October 1, Durham, this time with Albert, met with the undercover agent and the CI to discuss the details of the planned robbery. The undercover agent again explained that there were typically four Mexicans at the stash house, one of which carried a "chopper" and the others had handguns. They discussed the way in which they would enter the house, planning to surprise the Mexicans by entering the house through the front door after the undercover agent entered. Durham indicated that he had a "four man team." Again, the undercover agent made clear that he

7

wanted to meet the whole team in advance of the robbery, so that Durham and his associates would be familiar with him and could avoid hitting him during the home invasion.

Two weeks later, on October 14, Durham contacted the undercover agent to ask when the robbery would take place. The undercover agent set a meeting with Durham and his team for October 16. But on October 16, Durham texted that he had a "family emergency" and could not meet. The undercover agent explained that the following day was to be the day of the robbery and he wanted to meet with Durham and the entire team before that in order to get acquainted. Durham explained that he and his team had gotten "vests" and were ready to go. They met the following day. Durham arrived with three other individuals; Albert, Davis, and Hawkins. All four Defendants got into the undercover agent's car and began discussing the plan for carrying out the robbery. The undercover agent then explained that he needed to pick up a special Corvette with a hidden "trap" (a concealment compartment to hide drugs). Defendants asked when they were going to hit the stash house, and the undercover agent responded, "Now." The four

8

Defendants traveled with the undercover agent to pick up the Corvette, and indicated that they were ready to go to the stash house to carry out the plan. Upon arriving at the storage facility where the Corvette was kept, the undercover agent got into the Corvette and when he opened the trunk to show the four Defendants the hidden compartment, Durham, Hawkins and Davis pulled their guns on him and Durham said, "Don't move." The ATF special response team emerged from hiding in the storage unit and arrested the Defendants.

Defendants raise a few specific disputes to this factual recitation. They contend that it was the CI who first approached Durham in June 2014 about illegal activity, and that it was the CI who re-initiated contact with Durham in September 2014. Likewise, Defendants argue that it was the Government, through the CI and the undercover agent, who introduced the idea of a robbery, exerted pressure on Durham to follow through, and persuaded him that he would need to recruit a team with weapons to carry out the robbery. But these factual disputes, even if true on every score, describe activity that falls far short of the

9

outrageous and shocking conduct necessary to establish a due process
violation.

## II.   Outrageous Government Conduct Standard

Due process bars a conviction where "the conduct of law
enforcement agents is so outrageous that due process principles would
absolutely bar the government from invoking judicial processes to
obtain a conviction." *Russell*, 411 U.S. at 431-32. Conduct may be
deemed outrageous if "the government instigates the criminal activity,
provides the entire means for its execution, and runs the entire
operation with only meager assistance from the defendant." *United
States v. Puett*, 735 F.2d 1331, 1335 (11th Cir. 1984).

Defendants do not contend that the Government detailed the
planned robbery, that it provided Defendants with firearms, that it
forced or directed Durham to recruit a team of three accomplices, that it
provided the "know-how" to conduct a home invasion, or that it ran the
entire operation with only meager assistance from Durham. As
explained in detail below, Defendants have not set forth alleged conduct
on the part of the Government that could possibly sustain their claim of

10

outrageous Government action. Such an attack on an indictment may only be invoked in the "rarest and most outrageous circumstances." *United States v. Tobias*, 662 F.2d 381 (5th Cir. 1981).[6] Those circumstances are not present in this case. Indeed, the Eleventh Circuit has expressly declined to apply the outrageous conduct defense to substantially similar conduct. *See United States v. Sanchez*, 138 F.3d 1410 (11th Cir. 1998). Comparing the facts of this case to *Sanchez*, the magistrate judge found them to be "virtually indistinguishable." Defendants resist this comparison.

The charges in *Sanchez* grew out of a "reverse sting" operation where the defendants agreed to invade and steal drugs from a house they were told contained illegal drugs.[7] In fact, there was no house and

---

[6] Neither the Supreme Court nor the Eleventh Circuit has ever found a violation of due process based on the government's outrageous conduct. *United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011). Courts have consistently declined to find outrageous conduct in cases involving far more elaborate schemes and significantly more government involvement than what Defendants allege here.

[7] Similar challenges to "reverse sting" operations have been rejected by the Eleventh Circuit on numerous occasions. *See Sanchez*, 138 F.3d at 1413; *United States v. Savage,* 701 F.2d 867, 869-70 (11th Cir. 1983); *United States v. Gianni*, 678 F.2d 956 (11th Cir. 1982); *United States v. Nicoll,* 664 F.2d 1308, 1314-15 (5th Cir. Unit B 1982), *cert. denied,* 457 U.S. 1118 (1982), *rev'd on other grounds, United States v. Henry,* 749 F.2d 203 (5th Cir. 1984).

11

there were no drugs. A brief review of the facts in *Sanchez* reveals that the factual scenario is undeniably similar. In *Sanchez*, the Eleventh Circuit provided the following general summary of the facts:

> [The ATF] received information from a confidential informant about a group of armed home invaders who would "rip-off" narcotics from stash houses. Working with an informant and recording some of the conversations, the government created a reverse sting operation by which the defendants agreed to all the details of a home invasion. They were arrested in a parking lot where they had assembled in readiness for going to the stash house to steal the drugs, which they had been told would involve 50 kilograms of cocaine and 300 pounds of marijuana . . . ATF agents contacted individuals suspected of being involved in home invasions. Informed by these individuals that large amounts of narcotics could be stolen in a home invasion, defendants voluntarily agreed to participate.

*Sanchez*, 138 F.3d at 1412-14. Defendants argue that here, the idea of a stash house robbery was wholly instigated by the Government, unlike the situation in *Sanchez*. But the Court fails to see the difference urged by Defendants. Similar to Durham, defendant Sanchez argued on appeal that he was "minding his own business [and] was solicited to participate in a [government-manufactured new crime]." His co-defendants likewise argued that the government developed a plan to use an informant and an undercover agent to develop a fictitious stash

12

house scenario and that their involvement was only based upon the
government's provocation and tempting. "Absent [ ] coaching from the
federal agents, these individuals would never have found their way into
[f]ederal [c]ourt." The Eleventh Circuit was unpersuaded that the
Government's invitation to participate in a crime rose to the level of
misconduct, and this Court is equally unpersuaded. As in *Sanchez*,
Durham's availability for the crime, his recruitment of a team of three
accomplices, and the provision of a robbery plan and firearms was the
result of Defendants' activity, not the Government's.

In a further attempt to distinguish *Sanchez*, Defendants argue
that the defendants in *Sanchez* comprised a pre-existing criminal team,
while Durham was a lone operator. But Defendants do not challenge the
assertion that Durham was indeed the leader of a crew (a "four man
team") that conducted robberies, that he spent several years in state
prison for multiple robbery convictions, and that Durham stated he had
been on another "lick" in Alabama over the summer. Nor do they
challenge the fact that Durham and Albert met with the undercover
agent on October 1 to discuss the nature of the stash house,

13

demographics of the neighborhood, whether the drug suppliers had other watch houses in the area, the type of doors the houses had, how long the undercover agent would be inside, and the age of the Mexican cartel members, and most importantly that Defendants, not the undercover agent, would be responsible for scripting the robbery. When the undercover agent inquired about his "crew," Durham responded "Everybody I done rocked with, I done rocked with before, we go in on them folks boy." [1] at 8.

Defendants' objections, therefore, boil down to the assertion that the Government lured Durham into involving himself in a purported robbery and created a scenario under which he would have to bring weapons by repeatedly telling him that the stash house would be guarded by armed men. Again, such allegations falls far short of the outrageous and shocking government conduct required to establish a due process violation demanding dismissal.

In *Owen v. Wainright*, 806 F.2d 1519, 1522 (11th Cir. 1986), the defendants argued that a government informant obtained their participation in illegal activity "through persistent lucrative offers"

14

made by a confidential informant. Despite the defendants' initial

refusals to become involved in a criminal scheme, their involvement

was due to an informant's initiation and insistence. The court rejected

the notion that such allegations established a due process violation.

"[W]hile the informant suggested the criminal activity to the defendants

and continued to advise them on completing the transaction, the

defendants themselves took a significant role in obtaining the necessary

supplies." *Wainright*, 806 F.2d at 1522 (citing *United States v.*

*Mulherin*, 710 F.2d 731, 736 (11th Cir. 1983)); *see also United States v.*

*Simpson*, 2010 WL 1611483, at \*13 (D. Ariz. Apr. 20, 2010)

("[G]overnment 'luring' does not itself create an outrageous government

conduct defense.").[8]

---

[8] *Simpson* is an instructive case from the District of Arizona presenting a factually similar reverse sting operation. An undercover agent in *Simpson* arranged for a confidential informant to make contact with individuals who might be interested in a violent robbery. The informant arranged a meeting between the undercover agent and one of the defendants. The undercover agent devised a story about a fictitious stash house, told the defendant that the robbery would have to occur in daylight because he would not know the location of the drugs until he received a call, and he explained that the stash house was guarded by armed men. These details were specifically designed to ensure that the hypothetical robbery would involve potential violence so that only capable, undeterred, and "hard core" home invaders would be caught in the plan. The defendants then came up with a plan, recruited a number of individuals to assist, and were later arrested with

15

## III. Evidentiary Hearing

Finally, Defendants argue that they are entitled to an evidentiary hearing on the disputed facts outlined above. But Defendants have not alleged facts that, even if true, would entitle them to dismissal of the indictment. Thus, an evidentiary hearing would be of little value. *See United States v. Holloway*, 778 F.2d 653, 658 (11th Cir. 1985) ("[T]he prevalent rule as to the showing required to entitle a defendant to a hearing on a charge of prosecutorial misconduct is that if defendants raise a material fact which, if resolved in accordance with the defendants' contentions, would entitle them to relief, they would be entitled to a hearing.") (internal quotation marks omitted); *United States v. Dyman*, 739 F.2d 762, 768-69 (2d Cir. 1984) (holding that it was not error for trial court to decline to conduct full evidentiary hearing before trial on outrageous government conduct claim). There being no allegation of the sort of extreme circumstances of outrageous government conduct needed to constitute a due process violation, the

---

firearms on the day of the planned robbery. The court rejected the defendants' motion to dismiss based on outrageous government conduct.

16

Court agrees with Judge Scofield that a hearing is not warranted and Defendants' motions are due to be denied.

## IV. Conclusion

The Court adopts as its order the Report and Recommendation [108] and denies Defendants' motions to dismiss [85, 88, 89, 92].[9]

IT IS SO ORDERED this 30th day of April, 2015.

Timothy C. Batten, Sr.
United States District Judge

---

[9] The Court also denies [110], styled as "Motion to Dismiss Indictment," but which in fact contains Defendant Albert's objections to the R&R, and appears to have been re-filed as [111].

17